IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CARRIE COLLINS,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>OHIO DEPARTMENT OF<br>TRANSPORTATION, DISTRICT 11, *et al.*,<br><br>　　　　　　Defendants. | CASE NO. 5:21-CV-01573<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>__MEMORANDUM OPINION & ORDER__ |

Before the Court is the Ohio Department of Transportation and the Ohio Department of Transportation District 11's Motion for Summary Judgment.  (ECF Doc. 44 ("Motion").)  The Motion is fully briefed and ripe for decision.  (ECF Docs. 46, 47.)  The parties have consented to the magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 10.)  For the reasons set forth below, the Court **GRANTS** Defendants' Motion (ECF Doc. 44) and dismisses Plaintiff's Complaint with prejudice.

## I.        Background

Plaintiff Carrie Collins ("Plaintiff" or "Ms. Collins")[1] filed her Complaint against Ohio Department of Transportation and Ohio Department of Transportation District 11 (collectively "Defendants" or "ODOT") on August 12, 2021, seeking to remedy alleged violations of Title VII

---

[1] After the filing of the Complaint, Ms. Collins's last name changed to Hartrick.  (ECF Doc. 35 ("Collins Depo"), p. 13:8-11.)

in the workplace.  (ECF Doc. 1 ("Complaint"), p. 2, ¶ 6.)  Ms. Collins alleges she was subjected to sex-based disparate treatment, sex-based hostile work environment, and retaliation for engaging in protected activity by complaining of sex-based disparate treatment and hostile work environment from 2014 through 2021.  (*Id*. at p. 2, ¶ 6, p. 32, ¶133.)  She states that she complained of sex-based disparate treatment following her non-selection for a Fiscal Officer 2 position in 2014, and that those complaints "set the groundwork for repeated denials of promotions and progressive discipline, as well as a pattern of conduct directed at her which if considered individually may seem inconsequential, but when considered as a whole, over time, demonstrate discriminatory and retaliatory animus toward" her.  (ECF Doc. 46, p. 8.)

## A.    Factual Background

### 1.    ODOT and ODOT District 11

ODOT has twelve district offices in Ohio.  (ECF Doc. 44-4 ("Corey Decl."), p. 2, ¶ 4.) Each ODOT district has its own District Deputy Director ("DDD"), Business and Human Resources Administrator ("BHRA"), and Safety and Health Consultant.  (*Id*.)  The DDD "leads the district and is responsible for district operations."  (*Id*.)  "The BHRA is responsible for safety, hiring, training, and finance."  (*Id*.)  There is also a labor relations officer ("LRO") at the district level who "serves as a liaison for the deputy director to address any labor issues . . . in the district."  (ECF Doc. 40 ("Kunze Depo."), p. 26:1-6.)  The LRO is involved in addressing and making recommendations regarding disciplinary matters.  (*Id*. at pp. 26:21-28:17.)

Thomas Corey ("Mr. Corey") served as DDD at ODOT District 11, located in New Philadelphia, Ohio, from March 2019 through at least December 21, 2022.  (Corey Decl., p. 1, ¶ 2; ECF Doc. 41 ("Corey Depo."), p. 5:18-21.)  Lloyd MacAdam ("Mr. MacAdam") served as DDD of District 11 prior to Mr. Corey, from 2011 through 2018.  (ECF Doc. 36 ("MacAdam

Depo."), pp. 7:18-8:7.)  Two interim DDDs—Roxanne Kane and Nick Susich—were assigned to

District 11 after Mr. MacAdam's departure and before Mr. Corey started as DDD in District 11.

(*Id*. at p. 11:12-23.)

## 2. Plaintiff's Employment at ODOT

### a. Plaintiff's Positions at ODOT

Ms. Collins has been employed at ODOT District 11 since 1999.  (Complaint, p. 1, ¶ 1;

Collins Depo., pp. 19:23-20:2, p. 93:3-7.)  She started in 1999 as a college intern.  (Collins

Depo., p. 20:3-10.)  She was hired as a personal aide in the business and human resources

division around 2003 or 2004.  (*Id*. at p. 20:9-19.)  She transferred to the accounting department,

working first as an account clerk, then as a management analyst in October 2005, and finally as a

management analyst supervisor.  (*Id*. at pp. 21:13-23:17.)  In November 2012, Ms. Collins was

promoted by BHRA Ben Kunze ("Mr. Kunze") and DDD MacAdam to District 11 Health &

Safety Program Consultant ("Safety Consultant") after Mr. Kunze asked her if she was interested

in the Safety Consultant position.  (Collins Depo., pp. 23:16-25:5; Kunze Depo., p. 13:1-9; ECF

Doc. 44-2 ("Kunze Decl."), p. 2, ¶ 4; Complaint, p. 1, ¶ 1.)  Ms. Collins has held the Safety

Consultant position since November 2012.[2]  (Collins Depo., pp. 23:16-25:8; Complaint, p. 1, ¶ 1;

Cory Decl., p. 2, ¶ 5.)

Ms. Collins's position as Safety Consultant is an exempt, classified civil service position.

(Collins Depo., pp. 25:13-26:13.)  In that position, she is allowed to flex her required 80 hours

within a two-week work period.  (*Id*. at pp. 26:19-27:7.)  Ms. Collins supervised one employee

while in this position, safety and health inspector Todd Miles, who resigned around April 2022.

(*Id*. at pp. 27:8-28:10.)

---

[2] As of the filing of this Memorandum Opinion and Order, the Court has not been informed that Ms. Collins's
position with ODOT has changed.

### b.  Plaintiff's Supervisors at ODOT While Employed as Safety Consultant

Ms. Collins had multiple supervisors while employed as Safety Consultant at District 11.

Her supervisors—with titles and time periods—as attested to by Sheri Harris (fka Sheri

Laughlin), Human Capital Management Manager at ODOT District 11, are detailed below:

- Dec. 2012 to Jan. 2017 – Ben Kunze, BHRA, Deputy Director 5

- Jan. 2017 to Jan. 2018 – Sheri Laughlin, Human Capital Management Manager

- Feb. 2018 to March 2018 – Roxanne Kane, Business and Human Resources Manager, Deputy Director 5

- March 2018 to Dec. 2019 – Chad Cline, Interim Business and Human Resources Administrator

- Dec. 2019 to Jan. 2020 – Tom Corey, Deputy Director 6

- Jan. 2020 to April 2020 – Shannon Blocker, Human Capital Manager Senior Analyst (Temporary Position – Business and Human Resources Administrator)

- April 2020 to Oct. 2021 – Sheri Laughlin, Human Capital Management Manager

- Nov. 2011 to present[3] – Becky Giauque, Business and Human Resources Administrator

(ECF Doc. 44-1 ("Harris Decl."), p. 1, ¶ 1, p. 2, ¶ 5.)

### 3.  Generally Alleged Gender-Based Conduct/Statements

Prior to 2012, Ms. Collins contends there were "a number of female employees in District

11 that were . . . targeted [and] . . . removed from their positions" by DDD MacAdam and BHRA

Kunze, then placed in positions with less authority or no involvement in management.  (Collins

Depo., pp. 36:23-39:7.)  Ms. Collins could not recall males being removed from their positions.

(*Id*. at p. 39:5-7.)  Other asserted conduct or statements by Mr. MacAdam included:

---

[3] Ms. Harris signed her declaration on December 21, 2022.  (Harris Dec, pp. 1-4.)  The Court has not been informed that there was a subsequent change to Ms. Collins's supervisor since that date.

- Mr. MacAdam said the described females should have never been placed in their positions.  (*Id*. at pp. 57:14-58:6.)

- Mr. MacAdam expected and told the female employees they had to cook for breakfasts organized at ODOT, while the same was not expected of male employees.  (*Id*. at pp. 58:8-59:1.)  Ms. Collins knew of one male employee who cooked for other events, but not breakfasts.  (*Id*. at p. 59:2-5.)

- Mr. MacAdam wanted Ms. Collins to "look good," commented on how she was dressed, and wanted her to dress up for events.  (*Id*. at p. 39:10-22.)

- Mr. MacAdam referred to another female in District 11 as an albatross and made derogatory and gender-based comments about a subordinate female employee whose salary was greater than his.  (*Id*. at p. 45:1-13; Complaint, p. 4, ¶¶ 25-26.)

Other asserted conduct or statements by Mr. Kunze included:

- Mr. Kunze used a disrespectful tone towards women.  (Collins Depo., p. 59:13-21.)

- Mr. Kunze did not discipline male coworkers for things that were of greater magnitude than things Ms. Collins was disciplined for.  (*Id*. at pp. 41:10-42:11.)

- Mr. Kunze denied a request by Ms. Collins to obtain her CDL license through ODOT training classes, while other male exempt employees were allowed to take advantage of the ODOT training.  (*Id.* at pp. 50:8-52:9; Complaint, p. 5, ¶ 29.)

- Ms. Collins believed Mr. Kunze tried to ask her out; he approached her in her office and asked her if she was dating anyone at a time when he was going through a divorce.  (Collins Depo., pp. 42:10-43:4.)

Ms. Collins also asserts that Mr. Cline, who was promoted to LRO under Mr. MacAdam, made derogatory and gender-based comments towards a female employee in District 11.  (*Id.* at p. 46:10-13; Complaint, p. 4, ¶¶ 23-24.)  She further reports that she received different job assignments from her coworkers, and that Mr. Kunze, Mr. MacAdam, Mr. Corey, Ms. Blocker, and Ms. Harris expected more from her than her counterparts.  (Collins Depo., p. 44:1-23.)

### 4.  Plaintiff's 2014 Application for District 11 Fiscal Officer Position

In 2012, Mr. Kunze asked Ms. Collins to leave the accounting department and take the Safety Consultant position.  (Collins Depo., pp. 35:23-36:22; Complaint, p. 3, ¶ 14.)  He told her taking the Safety Consultant position "would just happen on a short-term . . . or a temporary

5

basis." (Collins Depo., p. 260:3-10; Complaint, p. 3, ¶ 14.)  Ms. Collins was not really interested in the safety position and was reluctant, but Mr. Kunze told her "do this for a little bit for us and then whenever the auditor's position becomes available, we'll give that to you."  (Collins Depo., p. 260:11-261:2.)  The Fiscal Officer 2 in District 11 reported to BHRA Kunze.  (Kunze Decl., p. 2, ¶ 5.)  Ms. Collins also reported to Mr. Kunze at that time.  (Harris Decl., p. 2, ¶ 5; Kunze Decl., p. 2, ¶ 6.; Collins Depo., p. 55:5-10.)

Matt Judy held the Fiscal Officer 2 position (aka District Auditor) that Ms. Collins was interested in.  (*Id*. at pp. 260:24-261:2; ECF Doc. 44, p. 3, n. 2.)  He retired from the Fiscal Officer 2 position in 2014.  (Collins Depo., p. 261:6-9; Kunze Decl., p. 2, ¶ 5, Kunze Depo., p. 17:7-11.)  Ms. Collins and thirty-eight other applicants applied for the Fiscal Officer 2 opening in 2014.  (Harris Decl., p. 4, ¶ 15, pp. 7-8.)  The three applicants selected for interviews were Ms. Collins, Amanda Wellman, and Scott Bates.  (Kunze Decl., p. 2, ¶ 5; Kunze Depo., p. 17:12-16.)  The interview panel consisted of Mr. Kunze, Mr. MacAdam, and Mr. Judy.  (Collins Depo., p. 53:11-15; Kunze Decl., p. 2, ¶ 5; Kunze Depo., p. 17:2-7.)  During the interview, Mr. Kunze questioned Ms. Collins about her then-current position in an aggressive manner.  (Collins Depo., p. 53:16-21, p. 55:11-23.)  The interviewers ranked the three candidates and then discussed who to select for the position.  (Kunze Depo., pp. 18:23-19:10; MacAdam Depo., pp. 15:11-16:6.)  Mr. Kunze and Mr. Judy both ranked the candidates in the following order: Mr. Bates first, Ms. Wellman second, and Ms. Collins third.  (Kunze Depo., p. 19:1-6; *see also* MacAdam Depo., p. 16:2.)  Mr. MacAdam ranked the candidates in the following order: Ms. Wellman first, Mr. Bates second, and Ms. Collins third.  (Kunze Depo., p. 19:7-10; *see also* MacAdam Depo., p. 16:2-3.)  Following a discussion, the interview panel selected Mr. Bates for the position.  (Kunze Depo., p. 19:11-13, p. 20:18-19; MacAdam Depo., p. 16:3-6.)  Mr. Kunze and Mr. Judy were more

familiar with Mr. Bates's work style and ethic; Mr. MacAdam had not worked alongside Mr. Bates.  (MacAdam Depo., p. 16:7-13; Kunze Decl., p. 2, ¶ 6.)  Mr. Kunze ranked Ms. Collins third because he sometimes had difficulty managing her.  (Kunze Decl., p. 2, ¶ 6.)  He was also concerned about her ability and willingness to send out the reports required by the Fiscal Officer 2 position in a timely manner, based on her past performance and her answers to questions during the interview.  (Kunze Depo., pp. 19:14-20:17; Kunze Decl., pp. 2-3, ¶¶ 7-8.)

After she was not selected for the Fiscal Officer 2 position, Ms. Collins says she complained to Mr. Kunze that she was the most qualified candidate for the position.  (Complaint, p. 6, ¶ 33; Collins Depo., p. 63:17-20, p. 64:1-5, pp. 264:16-265:15.)  Mr. Kunze acknowledges that he could tell Ms. Collins was upset when he told her Mr. Bates had been selected for the position, but denies that she complained about the selection of Mr. Bates or that she said Mr. Bates was not qualified for the position.  (Kunze Depo., pp. 36:1-37:6.)

Ms. Collins asserts that she told Mr. MacAdam she felt she "was being treated differently than [her] co-workers and [she] felt that [she] should have been given the finance position." (Collins Depo., p. 268:12-22.)  She also asserts that she told him in that conversation that she "felt women were being treated differently in the district."  (*Id.* at pp. 268:23-269:2.)  She states that Mr. MacAdam responded by saying she needed to "better" herself, and suggested she consider listening to religious tapes he had listened to when he was dealing with a work-related issue.  (*Id.* at p. 269:5-21.)  Mr. MacAdam acknowledges that Ms. Collins complained to him about not being selected because she thought she was the most qualified candidate, and agrees that he provided her with suggestions based on things he had done to when he was not selected for a job he felt he was the most qualified for.  (MacAdam Depo., p. 21:10-22:9.)

Ms. Collins did not file a complaint with ODOT or EEOC over not being selected. (Collins Depo., p. 65:16-24, p. 66:13-21.)  Instead, she says she spoke with other people and complained to other department head managers and counterparts at ODOT about feeling discriminated against and being passed over for the position.  (Collins Depo., pp. 65:19-67:4.) She stated "[i]t was very, very apparent to the internal people that there was a pattern and trend from removing female people from high level management positions in District 11."  (*Id*. at p. 263:16-20.)  Individuals she spoke with at ODOT discouraged her from filing an EEOC complaint, saying someone else who had filed an EEOC complaint was not treated well.  (*Id*. at pp. 66:1-67:4.)  She was told filing a complaint would be "career suicide."  (*Id*. at p. 65:22-24.)

### 5.     2017 Alleged Discriminatory/Retaliatory Action

Ms. Collins was not disciplined for performance or attendance issues between 2014 and 2017.  (Harris Decl., p. 2, ¶ 6.)  Instead, she alleges discriminatory and/or retaliatory action beginning in 2017.  Ms. Collins's supervisor switched from Mr. Kunze to Ms. Laughlin in 2017 and Todd Miles was removed as Ms. Collins's direct report in January 2017.  (Harris Decl., p. 2, ¶ 5; Complaint, p. 8, ¶ 40.)  Ms. Laughlin reported to BHRA Kunze.  (Kunze Depo., p. 9:10-13.) Ms. Laughlin required Ms. Collins to seek approval to flex her work hours, but the same was not required of other employees in the HR division.  (Complaint, pp. 8-9, ¶ 41, Collins Depo., pp. 88:22-92:20.)  Those other employees did not report to Ms. Laughlin.  (Collins Depo., p. 92:6-20.)  Ms. Laughlin also required Ms. Collins and all direct reports to copy her on all business-related emails.  (Harris Decl., p. 2, ¶ 8.)

### a.     Written Reprimand

On May 2, 2017, Ms. Laughlin issued a written reprimand to Ms. Collins for disseminating a list of authorized items for first aid kits without first seeking approval of that list.

8

(Collins Depo., pp. 166:12-170:11; ECF Doc. 37 ("Harris Depo."), pp. 16:17:2; ECF Doc. 35-7 ("Written Reprimand").)  Ms. Collins asserts she did not obtain approval before sending out the list of items, as directed by BHRA Kunze, because she received a conflicting order from LRO Cline, who reported to DDD MacAdam.  (Collins Depo., p. 168:8-21, p. 170:5-9.)

b.      **One-Day Working Suspension**

On August 30, 2017, Ms. Collins received a one-day working suspension because she did not copy Ms. Laughlin on a business email.  (Collins Depo., pp. 174:19-175:4; ECF Doc. 35-8.)  Ms. Collins asserts that she did not copy her supervisor on the email because she had previously been informed by LRO Cline that her supervisor was going to be changed to BHRA Roxanne Kane.  (Collins Depo., p. 174:4-24.)  Ms. Kane did not officially become Ms. Collins's supervisor until 2018.  (*Id.* at p. 176:15-19; Harris Decl., p. 2, ¶ 5; Complaint, p. 11, ¶ 11.)  Ms. Collins waived her right to a pre-disciplinary meeting and right to appeal to the State Personnel Board of Review, and voluntarily agreed to accept the one-day suspension.  (ECF Doc. 35-8, p. 3.)  Ms. Collins explains that she did so because LRO Cline called her into his office to discuss the disciplinary action and informed her she could be terminated for the offense, which she interpreted as a threat.  (Collins Depo., pp. 182:10-183:6.)  She did not file a complaint regarding Mr. Cline's behavior at that time.  (*Id.* at p. 183:7-186:6.)

6.      **Cline/Bates Investigations**

In March 2018, Mr. Cline was appointed acting-BHRA in District 11 by Roxanne Kane, who had been promoted to replace Mr. MacAdam as DDD.  (Corey Decl., p. 2, ¶ 6; Complaint, p. 1, ¶¶48-49.)  Mr. Cline continued to also serve as LRO in District 11.  (Corey Decl., p. 2, ¶ 6.)

Mr. Cline and Mr. Bates became the subjects of an investigation by the Ohio Inspector General ("OIG") into self-dealing with vendor contracts based on a November 18, 2018

anonymous complaint.  (Rossi Decl., p. 1, ¶ 4.)  The OIG released its report in December 2019.  (*Id*. at p. 2, ¶ 5, Exhibit 1 to Rossi Decl. (ECF Doc. 44-3, pp. 47-75).)  "The OIG found reasonable cause to believe that a wrongful act (Conflict of Interest) was committed."  (Rossi Decl., p. 2, ¶ 7.)  As part of the OIG's investigation, allegations "surfaced that there was suspected retaliation against several of the ODOT employees interviewed as a part of the investigation."  (Rossi Decl., p. 2, ¶ 7; ECF Doc. 44-3, pp. 50, 63-69.)

The OIG's investigation into the suspected retaliation "revealed that after the interviews began, Bates and Cline began to treat employees of the BHRA/Accounting suite differently based on their suspicions of the employees' involvement in initiating the investigation."  (ECF Doc. 44-3, p. 72.)  The investigators also "determined that Cline began to treat Carrie Collins as if she was the person responsible for bringing this unwanted attention to the BHR/Accounting section," finding that "[o]n March 4, 2019, Cline sent the first of five referrals to ODOT investigators and the Human Resources Department at ODOT Central Office alleging that Collins had falsified payroll records."  (*Id*.)  Based on OIG's investigation, including an interview with ODOT Payroll and Benefits Manager, they determined Ms. Collins's adjustments to her "payroll were not falsifications and . . . [she] followed proper procedure."  (*Id*.)

Mr. Bates and Mr. Cline were placed on administrative leave and removed from the ODOT premises when the OIG Report was released.  (Corey Depo., p. 21:9-17.)  ODOT then conducted its own internal investigation through its Office of Investigative Services ("OIS").  (Rossi Decl., p. 2, ¶¶ 8-9.)  OIS Investigator Jeff Rossi conducted the investigation and interviewed various ODOT employees, including Ms. Collins.  (*Id*.)  Ms. Collins reported during her interview with Mr. Rossi that she believed she was the target of retaliatory and hostile behavior by Mr. Bates and Mr. Cline because they believed she was the anonymous complainant.

(Rossi Decl., p. 3, ¶ 13; ECF Doc. 44-3, pp. 225, 226.)  The OIS investigation, which was completed in February 2020, confirmed that Ms. Collins was retaliated against by Mr. Cline due to his and Mr. Bates's belief that she was the anonymous complainant.  (Rossi Decl., p. 2, ¶ 10; ECF Doc. 44-3, p. 44; ECF Doc. 44-6 ("Hurst Decl."), p. 1, ¶ 5.)  The OIS investigation also found that two employees resigned from District 11 because of their fear of retaliation by Mr. Bates and their inability to ask Mr. Cline for assistance.  (ECF Doc. 44-3, p. 44.)  Ms. Collins did not inform Mr. Rossi during his investigation that she felt discriminated or retaliated against by Mr. Bates, Mr. Cline, or any other ODOT employee based on her sex or because she had complained about sex discrimination.  (Rossi Decl., pp. 2-3, ¶¶ 11-12; Collins Depo., pp. 101:8-102:16.)  Mr. Bates and Mr. Cline were permitted to resign in lieu of termination from ODOT following the investigations.  (Hurst Decl., pp. 1-2, ¶ 5; Collins Depo., p. 153:1-3.)

### 7.    2019 Alleged Discriminatory/Retaliatory Actions by Mr. Cline

In addition to Mr. Cline's unsubstantiated accusations that she falsified time records, as outlined in the investigatory reports discussed above, Ms. Collins asserts that Mr. Cline engaged in other inappropriate conduct.  (ECF Doc. 46, pp. 10-11; Complaint, p. 13, ¶ 59, pp. 15-16, ¶¶ 65-70.)  In 2019, she alleges Mr. Cline engaged in the following conduct:

- He offered Ms. Collins a drink ticket at a conference.  (Complaint, p. 13, ¶¶59-60.)

- He told Ms. Collins it was good she would be an event because "you can be the pretty face for the camera."  (*Id*. at p. 15, ¶ 65.)

- He told Ms. Collins she should be happier.  (*Id*. at ¶ 66.)

- He told Ms. Collins it should not be a problem to move a Roadeo event, but then told her the event could not be moved after she spoke with Mr. Corey about moving the event and complained that Mr. Cline turned her in for falsifying time records, treated her differently, and retaliated against her.  (*Id.* at pp. 15-16, ¶¶ 67-69.)

- He said he should write Ms. Collins up for not letting him know she was teaching a CPR class so he could report to that location on that day.  (*Id.* at p. 16, ¶ 70.)

11

8.     **2020 Reassignment of Ms. Laughlin as Ms. Collins's Supervisor and Ms. Laughlin's Alleged Conduct Towards Ms. Collins**

Mr. Corey supervised Ms. Collins for a short period after Mr. Cline's resignation, then Ms. Blocker supervised her from January to April 2020.  (Harris Decl., p. 2, ¶ 5.)  In April 2020, Mr. Corey assigned Ms. Laughlin to be Ms. Collins's supervisor.  (*Id*.)  Ms. Collins believed Mr. Corey reassigned Ms. Laughlin as her supervisor to punish her for his friend, Mr. Cline, losing his job.  (Collins Depo., pp. 131:15-132:20.)  She states that the first thing Mr. Corey did after the conclusion of the investigation was to put Ms. Collins back under a supervisor that he knew she "had issues with and that was treating [her] terribly[.]"  (*Id*.)  Mr. Corey also assigned Ms. Laughlin to supervise other ODOT employees who had complained to Mr. Corey.  (*Id*. at pp. 132:21-133:6.)

In the June/July 2020 time frame, Ms. Collins was excluded from BHRA staff meetings that she had regularly attended in the past.  (Collins Depo., pp. 135:14-138:16.)  She was the only department head who was excluded.  (*Id*. at p. 137:1-6.)  Rather than attending meetings like she had in the past, she had to provide her update to Ms. Laughlin, who then provided the updates at the meetings.  (*Id*. at p. 138:8-16.)  Ms. Collins was able to attend those meetings again once Ms. Giauque became her supervisor in late 2021.  (Collins Depo., pp. 138:17-139:8; Harris Decl., p. 2, ¶ 5.)

On October 13, 2020, Ms. Collins told Mr. Hurst—who was in charge of the snow and ice auxiliary roster[4]—that she had obtained her Class B CDL and planned to sign up for Snow and Ice Auxiliary and take a blood test two weeks after her October 13, 2020 scheduled surgery.  (Complaint, pp. 24-25, ¶ 101; Blocker Depo., pp. 58:21-22, 59:13-60:11.)  Ms. Laughlin sent

---

[4]Auxiliary drivers could choose the counties they wanted to sign up for and management staff in each county was responsible for calling out the plows.  (Collins Depo, p. 287:4-18.)

Ms. Collins a notice for a mandatory drug test on October 22, 2020, which Ms. Collins questioned because she was not subject to random drug tests. (Complaint, p. 25, ¶ 102.) Ms. Laughlin responded that she could mandate a drug test. (*Id*.) Ms. Collins contacted ODOT Central Office Labor Relations and was told she would not be sent for a drug test. (*Id*.) Mr. Hurst subsequently called her and yelled at her for calling his boss and indicated that there may not be availability for auxiliary plow drivers once she took her drug test. (*Id*.) Ms. Collins contends this is another act of discrimination and retaliation. (*Id*.) She submitted her auxiliary plow application, took and passed the blood test, and was never called to plow snow, even though male co-workers were afforded multiple opportunities to plow snow during the winter 2020-2021. (*Id*. at pp. 25-26, ¶¶ 103-04; Collins Depo., p. 288:1-3.)

Ms. Blocker acknowledged there were personality conflicts and communication issues between Ms. Laughlin and Ms. Collins, and that she spoke with Ms. Laughlin about different ways to approach her communications with Ms. Collins. (Blocker Depo., pp. 27:7-28:19.) Ms. Blocker also spoke with Mr. Corey about the matter. (*Id.* at pp. 31:5-21.) Mr. Corey attempted to coach Ms. Laughlin about her conduct in the workplace, as other employees complained about Ms. Laughlin. (Corey Depo., pp. 17:22-19:4.) Ms. Laughlin later emailed Mr. Hurst, with a copy to Ms. Blocker, regarding "some performance/attitude issues" she was having with Ms. Collins. (ECF Doc. 37-3; Harris Depo., p. 69:11-24.) Mr. Hurst was the acting LRO at the time. (Harris Depo., pp. 69:25-70:4.) Ms. Blocker asked Ms. Laughlin to "write up issues that [she] was having with Carrie at that time." (*Id*. at p. 69:22-24.) The email is undated, but it has an attachment bearing the date of October 16, 2020. (ECF Doc. 37-3, p. 1.)

### 9.    2020 EEOC Charge

Ms. Collins filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on September 4, 2020, alleging sex-based discrimination and retaliation from 2014 through 2020.  (ECF Doc. 1-1.)  ODOT's Affirmative Action Officer and Title VII Program Manager Robin Fogt received a copy of the September 4, 2020 EEOC administrative charge on November 10, 2020.  (ECF Doc. 44-5 ("Fogt Decl."), p. 2, ¶ 8.)  Ms. Collins filed an amended EEOC charge on May 5, 2021, alleging discrimination through April 19, 2021, which Ms. Fogt received on May 6, 2021.  (ECF Doc. 1-2; Fogt Decl., p. 2, ¶ 9.)  Mr. Corey and Ms. Blocker were not questioned regarding Ms. Collins's claims of discrimination and retaliation.  (Corey Depo., p. 45:3-7; ECF Doc. 39 ("Blocker Depo."), p. 53:15-22.)  Ms. Laughlin also does not recall being questioned about the EEOC charges filed by Ms. Collins. (Harris Depo., pp. 60:17-61:20.)

### 10.    2020 Todd Miles Investigation and Resulting Discipline

District 11 Safety Inspector Todd Miles, a direct report of Ms. Collins, was investigated by ODOT OIS in early 2020 for claiming work that he was not performing.  (ECF Doc. 35-9, p. 4; Collins Depo., pp. 188:1-190:4.)  As part of the investigation, Ms. Collins was interviewed on April 29, 2020.  (Hurst Decl., p. 2, ¶ 8.)  ODOT concluded that Mr. Miles misused state time and equipment.  (*Id*. at ¶ 9; ECF Doc. 35-9, p. 4; Collins Depo., p. 139:17-22.)  The investigation also found that Ms. Collins failed to supervise Mr. Miles and ensure that his work was completed.  (Hurst Decl., p. 2, ¶ 9; ECF Doc. 35-9.)  LRO Hurst served Ms. Collins with a pre-disciplinary notice on September 23, 2020; she waived her right to a pre-disciplinary meeting and right to appeal to the State Personnel Board of Review and voluntarily agreed to accept a

two-day suspension.  (ECF Doc. 35-9, pp. 5-6.)  She received a two-day working suspension and suffered no loss in pay or benefits.  (*Id*. at pp. 1-3; Hurst Decl., p. 2, ¶ 11.)

Ms. Collins states that she signed the waiver and accepted the suspension because Mr. Hurst told her she could be subject to termination if she did not agree to sign the waiver, and that she was receiving progressive discipline.  (Collins Depo., p. 191:1-7.)  She was surprised that she was subject to progressive discipline because she thought her prior discipline was no longer on her record due to the passage of time.  (*Id*. at 191:7-24.)  Ms. Collins told Mr. Hurst that she thought the discipline was being imposed at Mr. Corey's direction in retaliation for the Bates/Cline situation.  (*Id*. at pp. 194:12-195:16.)  Ms. Collins states she told Mr. Hurst during her meeting with him that she had filed an EEOC charge.  (*Id*. at pp. 143:18-145:5.)  Mr. Hurst states that Ms. Collins did not tell him during their September 23, 2020 meeting that she had filed an EEOC charge; he also states that she did not complain about sex discrimination or being retaliated against at that time.  (Hurst Decl., p. 2, ¶ 12.)

### 11.    Plaintiff's 2020 Expectations Sheet

After Ms. Collins received the two-day working suspension in September 2020, Mr. Corey suggested "an expectations agreement would help Collins best to carry-out her duties and succeed in her position" and acting-BHRA Blocker agreed.  (ECF Doc. 44-7 ("Blocker Decl."), p. 2, ¶ 6; Blocker Depo., pp. 43:21-44:13.)  Ms. Blocker was primarily responsible for drafting the agreement, with input from then-supervisor Ms. Harris, Mr. Corey, and a District 11 Highway Administrator.  (Blocker Decl., p. 2, ¶ 6; Blocker Depo., pp. 41:22-42:8.)

Ms. Laughlin sent Ms. Collins the expectations sheet via email on October 5, 2020, indicating that changes discussed the prior week had been made.  (ECF Doc. 39-1.)  Ms. Laughlin signed the document on October 1, 2020, and Ms. Blocker and Ms. Collins signed the

document on October 5, 2020.  (ECF Doc. 35-10.)  An expectations sheet was also created for

Mr. Miles.  (Blocker Depo., p. 49:9-22.)  Ms. Blocker had not seen expectations sheets of this

type used with any other employee at ODOT.  (*Id*. at p. 49:5-8.)  The expectations sheet items

were in addition to Ms. Collins's already established regular job duties.  (ECF Doc. 35-10, p. 1.)

Among the items included were expectations regarding Ms. Collins's core hours and how she

could flex her time and request time off.  (ECF Doc. 35-10, p. 1.)  The expectations sheet also set

forth an expectation that Ms. Collins would send a weekly summary email to Ms. Laughlin by

the end of business every Friday.  (*Id*.)

### 12.     March 2021 Discipline for Failing to Follow Expectations Sheet

On February 11, 2021, Mr. Hurst conducted an investigative interview with Ms. Collins

regarding her alleged failure to follow work expectations and her performance of personal

business on work time on January 14, 2021.  (Hurst Decl., p. 3, ¶ 14; Complaint, p. 27, ¶ 109.)

He found the allegation that she performed personal business on work time on January 14, 2021,

to be unfounded.  (ECF Doc. 44-6, p. 16; *see also* Complaint, p. 27, ¶ 109.)  A hearing officer

conducted a pre-disciplinary hearing regarding the asserted failure to follow work expectations

on March 11, 2021, which was attended by Ms. Collins and Mr. Hurst.  (ECF Doc. 44-6, pp. 13,

15-17.)  The hearing officer did not consider the allegation regarding performance of personal

business on state time.  (*Id*. at p. 16.)  But he found just cause for discipline as to the other

allegations.  (*Id*.)  On March 22, 2021, Ms. Collins received a three-day, non-working suspension

without pay for (1) failing to notify her supervisor that she was taking time off on December 31,

2020, and (2) failing to turn in timely weekly summaries—as required by her expectations

agreement—on five occasions over the course of three months.  (Hurst Decl., p. 3, ¶ 15; ECF

Doc. 44-6, pp. 9-12.)

16

13.     **Plaintiff's Internal ODOT Complaints 2020-2021**

        a.     **October 28, 2020 Complaint**

Ms. Collins emailed Ms. Blocker to complain about retaliation and harassment on October 28, 2020, after Ms. Blocker asked Ms. Collins to give Ms. Laughlin more specific documentation regarding the costs associated with servicing fire extinguishers.  (Blocker Depo., pp. 79:20-23; 80:14-82:3; Blocker Decl., p. 3, ¶ 8; ECF Doc. 39-3, p. 2.)  She wrote: "I continue to be directed to complete work that my equivalent level co-workers are not having to do, and that is retaliation and discrimination."  (ECF Doc. 39-3, p. 2.)  She explained she had "done nothing to warrant having to have each of [her] purchases 'approved' by Sheri prior to purchasing, especially a small dollar purchase[.]"  (*Id*.)  She complained that Ms. Laughlin continued to harass her by requiring her to perform "'because I say so' tasks" to waste her time and keep her from completing her required job duties.  (*Id*.)

Ms. Blocker forwarded Ms. Collins's October 28, 2020 email to LRO Hurst, stating: "Carrie is using some big words below, I do not plan on responding to this email but thought labor should be aware."  (*Id*. at p. 1; Blocker Depo., pp. 82:4-14.)  Ms. Blocker also verbally reported Ms. Collins's complaint to Mr. Corey, telling him she had forwarded the email to Mr. Hurst and he would be hearing from him.  (*Id*. at pp. 107:21-108:18.)  Ms. Blocker did not send Ms. Collins's email to ODOT's Equal Employment Opportunity office because she felt it would be Mr. Hurst's job and he would send it to the "appropriate avenue."  (Blocker Depo., pp. 83:17-84:12.)  Ms. Blocker did not recall speaking with anyone from ODOT's EEO office regarding the October 28, 2020 complaint.  (*Id*. at p. 85:8-13, p. 108:19-23.)

17

b.        **January 8, 2021 Complaint**

On January 11, 2021, Ms. Collins emailed legal counsel at ODOT—Jodi Elsass-Locker and Brian Brown—stating: "I am reaching out, again, for your assistance in stopping the retaliation I am experiencing in District 11."  (ECF Doc. 38-2, pp. 3-4; Hurst Decl., p. 2, ¶ 13.) She complained that she was given a direct order to conduct in-person safety meetings at each of the seven county garages in the District during the pandemic after questioning why a safety recognition program could not be restarted in District 11.  (*Id*.)  She asked for guidance as to how to proceed in light of the Governor's COVID-19 protocols and ODOT's COVID-19 directives. (ECF Doc. 38-2, pp. 3-4.)

Ms. Elsass-Locker responded to Ms. Collins by email on January 12, 2021, copying Mr. Brown and Mr. Hurst, saying she had asked Mr. Corey and Ms. Blocker to discuss with Ms. Collins ways she could perform the task; she also asked Ms. Collins to "identify what actions [were] being taken that [were] retaliatory."  (*Id*. at pp. 2-3.)  The following morning, Ms. Collins responded by email that she was being expected to hold in-person meetings when no one else in District 11 or at any other location was required to do so; she felt she was "being treated disproportionately by Mrs. Blocker, Mr. Corey and Mrs. Laughlin in D11" and the treatment she was "receiving [was] unlike anything" she had "experienced in [her] 21 year career at ODOT" and she "just want[ed] it to stop."[5]  (*Id*. at p. 2.)  On that same day, Ms. Elsass-Locker forwarded Ms. Collins's email to ODOT Affirmative Action Officer and Title VII Program Manager Robin Fogt, who worked in ODOT's Office of Equal Opportunity, with a copy to ODOT Labor Relations Administrator Bobby Johnson and Mr. Hurst. (ECF Doc. 38-2, p. 1; Fogt Decl., p. 1, ¶ 2.)  Ms. Elsass-Locker asked Ms. Fogt if it was something her office would need to look into.

---

[5] At some point in January 2021, Ms. Blocker and Mr. Corey met with Ms. Collins "to discuss possible strategies for her to conduct the trainings in-person with limited risk of spreading COVID-19."  (Blocker Decl., p. 3, ¶ 9.)

(ECF Doc. 38-2, p. 1.)  Mr. Johnson forwarded that email to Mr. Brown, stating "FYI."  (*Id.*; ECF Doc. 38 ("Brown Depo."), pp. 27:23-28:16.)  Mr. Brown did not recall discussions with Mr. Johnson following his receipt of the email.  (Brown Depo., p. 28:17-19.)

###### c.    March 3, 2021 Complaint

Ms. Collins filed an internal EEO complaint on March 3, 2021, with the Office of Equal Opportunity ("OEO"), alleging she was being subjected to retaliatory behavior and/or harassment based on gender / sexual harassment.  (Fogt Decl., pp. 2-3, ¶ 10; ECF Doc. 44-5, p. 39.)  The office of OEO contacted Ms. Collins on March 24, 2021, to gather information regarding her complaint.  (ECF Doc. 44-5, p. 39.)  Ms. Collins asserted during those discussions that she was being retaliated against for engaging in an investigation.  (*Id.*)  ODOT Equal Opportunity Investigator Tiffany Cerena responded to Ms. Collins's March 3, 2021 complaint in an April 21, 2021 letter.  (*Id.*)  She acknowledged that Ms. Collins's allegations "include[d] unfavorable treatment by [her] supervisor and resulting disciplinary action," but noted that "the investigation [Ms. Collins] participated in was not based on membership in a protected class." (*Id.*)  Rather, she explained that Ms. Collins "served as a witness in an investigation regarding others' inappropriate conduct which violated state and ODOT policy."  (*Id.*)  Additionally, Ms. Cerena informed Ms. Collins that her harassment allegations "based on gender and/or sexual harassment [did] not fall under OEO's purview, as the incidents alleged were previously investigated or did not occur within the prior 180-days."  (*Id.*)

###### 14.    Other Positions for Which Plaintiff Was Not Selected After 2014

In addition to the alleged retaliatory discipline and other actions outlined above, Ms. Collins contends that she was not considered or selected for other positions at ODOT due to gender discrimination and/or retaliation stemming from her complaints about not being selected

for the Fiscal Officer 2 position in 2014.  (ECF Doc. 46, p. 8.)  The factual circumstances

surrounding those positions are detailed below.

### a.      Plaintiff's 2017 Application for Human Capital Manager Position

Ms. Collins applied for a Human Capital Analyst position at ODOT District 11 in

January 2017.  (Complaint, p. 8, ¶ 39; Collins Depo., pp. 75:21-76:23.)  There were other

applicants, including men and women.  (Collins Depo., pp. 77:14-78:1.)  Ms. Collins was not

selected for the position; instead, Sheri Laughlin was selected.  (Complaint, p. 8, ¶ 39; Collins

Depo., p. 77:22-23; Harris Depo., pp. 6:22-7:6.)  Ms. Collins did not believe Ms. Laughlin met

the minimum qualifications for the position.  (Complaint, p. 8, ¶ 39; Collins Depo., p. 78:2-23.)

Ms. Collins believed she was more qualified but was passed over because she had complained

about not getting the Fiscal Officer 2 position.  (Collins Depo., pp. 79:2-80:6.)

### b.      2017 District 3 Fiscal Officer 2 position

In July 2017, Ms. Collins applied for a Fiscal Officer 2 opening in District 3.

(Complaint, p. 10, ¶ 43; Collins Depo., pp. 92:21-95:19.)  She did not receive an interview,

which she feels was the result of interference by Mr. Kunze, Mr. Cline, and Mr. MacAdam.

(Complaint, p. 10, ¶ 43; Collins Depo., pp. 93:14-95:19.)

### c.      2019 Temporary Appointment of Fiscal Officer 2

When Mr. Bates resigned from the Fiscal Officer 2 position, Mr. Corey appointed Kelsey

Allensworth to fill the position on temporary basis in December 2019.  (Complaint, p. 18, ¶ 77;

Collins Depo., pp. 128:24-129:5.)  Ms. Collins did not feel that Ms. Allensworth, a bargaining

unit employee, was qualified for the position.  (Complaint, p. 18, ¶ 77; Collins Depo., pp. 129:2-

130:5.)  Ms. Collins informed Mr. Corey she was willing to help and would be interested in the

position.  (Collins Depo., p. 131:3-9; Corey Depo., p. 36:7-19.)  Instead of providing her with the

opportunity, Ms. Collins asserts Mr. Corey chose someone else because he and Mr. Cline were friends.  (Collins Depo., p. 131:10-12.)  She felt Mr. Corey "was trying to punish [her] for Chad Cline having lost his job."  (*Id*. at p. 131:13-17.)

### d.    2021 Permanent Appointment of Fiscal Officer 2

On February 16, 2021, ODOT posted an opening for the Fiscal Officer 2 position in District 11 that was temporarily filled by Ms. Allensworth.  (Complaint, p. 28, ¶ 111; Corey Depo., p. 37:15-20.)  There were applicants for the position, but no interviews were conducted.  (Corey Depo., p. 37:21-24.)  Mr. Corey chose Ms. Allensworth to permanently fill the position because he felt she "was the best person for that position" because of "her good attitude, her great work ethic, [and] her reputation with the people she serve[d]."  (*Id*. at p. 38:1-7.)

Ms. Collins asserted in her Complaint that the investigation initiated by Mr. Hurst on February 11, 2021, was "a means to preclude [her] from applying for the position because [she] was under investigation for a, pretextual, violation of ODOT policies and procedures."  (Complaint, p. 27, ¶ 109, p. 28, ¶ 111.)  During her deposition, she stated that she applied for the position and felt she was the most qualified for the position.  (Collins Depo., p. 154:5-7, 14-19.)

Ms. Collins also noted during her deposition that Mr. Corey was part of the District 11 administration in 2014, when she was not selected for the Fiscal Officer 2 position.  (*Id*. at p. 155:15-156:10.)  Thus, even though Mr. Corey selected another female for the 2021 position and did not participate in the selection of a male candidate over Ms. Collins for the 2014 position, Ms. Collins felt her non-selection for the Fiscal Officer 2 position in 2021 was nevertheless based on sex discrimination or retaliation for her comments after her non-selection for the Fiscal Officer 2 position in 2014.  (*Id*. at pp. 154:20-158:16.)

**B.     Procedural History**

Ms. Collins filed her present Complaint against Defendants on August 12, 2021, asserting

that Defendants have discriminated against her in violation of Title VII since 2014.  She alleges

discrimination based on sex-based disparate treatment and a sex-based hostile work environment

in violation of Title VII, 42 U.S.C. § 2000e *et seq*.  (Complaint, p. 2, ¶¶ 6-7, pp. 2-31, ¶¶ 10-

131.)  She also alleges sex-based retaliation in violation of Title VII, 42 U.S.C. § 2000e-3.  (*Id*.

at p. 2, ¶¶6, 8, pp. 31-33, ¶¶132-39.)

Defendants filed their Motion for Summary Judgment on December 22, 2022, seeking

dismissal of all claims.  (ECF Docs. 44, 47.)  They argue that Ms. Collins failed to exhaust her

administrative remedies for any acts of sex-based disparate treatment or retaliation prior to

November 9, 2019, and that there is no evidence to show a continuous violation between her

alleged verbal complaint in 2014 and the filing of her EEOC complaint in September 2020.  (*Id*.)

They also argue that Ms. Collins is unable to "make out a case of sex discrimination, or

retaliation" because she "cannot establish that . . . her engaging in Title VII protected activity

was the but for cause of any material adverse action," and she "has provided no evidence that she

was subjected to even one legitimate instance of severe, let alone pervasive, harassment

sufficient for a hostile work environment claim."  (ECF Doc. 44, p. 40.)

In response, Ms. Collins argues: "Since 2014, despite her attempts to advance to other

positions within ODOT District 11, she has not been selected for advancement.  Rather, she . . .

has been subjected to retaliatory progressive discipline on account of her complaints of

sex/gender-based discrimination in the workplace."  (ECF Doc. 46, p. 5.)   Further, she argues

that "[t]he discrimination, and particularly the retaliation she has been subjected to over time,

when considered as a whole demonstrates a course of conduct geared to deny her positions[] she

was otherwise qualified for, subject her to work rules that other employees are not required to follow, and to subject her to discipline for trivial matters that had no impact on ODOT's mission." (*Id.*) As to the exhaustion of administrative remedies, she contends that she can demonstrate a continuing violation for alleged retaliatory and discriminatory acts prior to 2019. (ECF Doc. 46, pp. 17-19.) She also asserts that she has established a claim of retaliation under Title VII based on discipline imposed in 2017, 2020, and 2021. (*Id.* at pp. 20-23.) Although ODOT has articulated facially legitimate and non-discriminatory / non-retaliatory reasons for that discipline, Ms. Collins argues she has presented evidence to show that those reasons were pre-textual. (*Id.* at pp. 19-25.) She further asserts that she can establish she was subjected to a sex-based hostile work environment. (*Id.* at pp. 25-28.) Finally, she argues that she can establish sex-based discrimination based on the selection of Mr. Bates over her and another female candidate for the Fiscal Officer 2 position in 2014 because a "reasonable jury could conclude that the decision to select a male was mere pretext for discrimination against Collins and the other female candidate." (*Id.* at pp. 28-29.)

## II.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden to show that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations, citations, and alterations omitted). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Id*. at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Prod., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). Thus, for a plaintiff to avoid summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* (internal citations, emphasis, and bracket omitted).

### III.     Discussion

Defendants argue first that some of Ms. Collins's claims of discrimination and retaliation are subject to dismissal because she failed to exhaust administrative remedies. (ECF Doc. 44, pp. 23-24; ECF Doc. 47, pp. 3-6.) Plaintiff counters that administrative exhaustion requirements

were satisfied for all claims because her claims are based upon a continuing violation dating

back to 2014.  (ECF Doc. 46, pp. 17-19.)  The Court turns first to exhaustion before addressing

the merits of the claims of disparate treatment, retaliation, and hostile work environment.

**A.**     **Whether Claims Are Subject to Dismissal Based on Failure to Exhaust**
         **Administrative Remedies**

Defendants argue that the Court should dismiss all sex-based disparate treatment and

retaliation claims alleged to have occurred prior to November 9, 2019, i.e., more than 300 days

before her September 4, 2020 EEOC charge.  (ECF Doc. 44, pp. 23-24; ECF Doc. 47, pp. 3-6.)

Ms. Collins asserts she exhausted her administrative remedies for all claims because her "claims

are based upon a continuing violation from 2014 when she complained to Kunze and MacAdam

about the sex-based disparate treatment of women in District 11."  (ECF Doc. 46, pp. 17-19.)

**1.**     **Legal Framework for Administrative Exhaustion**

Title VII requires a plaintiff to file an unlawful employment practice charge within a

specified period.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (explaining

"42 U.S.C. §2000e-5(e)(1) is a charge filing provision that 'specifies with precision' the

prerequisites that a plaintiff must satisfy before filing suit") (internal citations omitted).  Under

42 U.S.C. § 2000e-(5)(e)(1), a plaintiff "*shall*" file her EEOC charge within either 180 or 300

days "*after the alleged unlawful employment practice occurred*."  *Id.* (emphasis in original).  The

Supreme Court has explained what constitutes an "unlawful employment practice" and when a

practice has "occurred" for two types of claims, those involving discrete discriminatory acts and

those involving a hostile work environment.  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 110.

As to discrete discriminatory acts, the Supreme Court explained that a "[a] discrete

retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"  *Nat'l R.R. Passenger

Corp.*, 536 U.S. at 110.  Thus, "[a] party must file a charge within either 180 or 300 days of the

date of the act or lose the ability to recover for it." *Id.*  The Court rejected the argument that the term "practice" in the statute "connotes an ongoing violation that can endure or recur over a period of time," concluding that "[t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.* at 110, 111.  Additionally, the Court explained: "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period" and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at pp. 112-13.

As to hostile work environment claims, the Supreme Court explained "[h]ostile environment claims are different in kind from discrete acts" given that "[t]heir very nature involves repeated conduct."  536 U.S. at 115.  Therefore, "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day." *Id.*  Instead, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*  (internal citation omitted).  Since "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice'" and because "[t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened[,] [i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117.  Thus, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*  "In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118.

In summary, the Supreme Court concluded that:

> [A] Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts
> must file his charge within the appropriate time period—180 or 300 days—set forth
> in 42 U.S.C. § 2000e–5(e)(1). A charge alleging a hostile work environment claim,
> however, will not be time barred so long as all acts which constitute the claim are
> part of the same unlawful employment practice and at least one act falls within the
> time period. Neither holding, however, precludes a court from applying equitable
> doctrines that may toll or limit the time period.

*Nat'l R.R. Passenger Corp.*, 536 U.S. at 122.  Under this guidance, the Court first addresses the

timeliness of the discrete claims and then turns to the hostile work environment claim.

### 2.      Timeliness of Discrete Claims of Discrimination and Retaliation

There is no dispute that Ms. Collins filed her EEOC charge on September 4, 2020.  (ECF

Doc. 1-1; ECF Doc. 44-5, p. 2, ¶ 8.)  Accordingly, any discrete claims of discrimination or

retaliation alleged by Ms. Collins that occurred more than 300 days prior to the September 4,

2020 filing—prior to November 9, 2019—are untimely and not actionable, and must be

dismissed with prejudice.  This includes Ms. Collins's claims that: (1) she was discriminated

against based on sex when she was not selected for the Fiscal Officer 2 position in 2014; (2) the

written reprimand issued by Ms. Laughlin on May 2, 2017, was sex-based discriminatory and/or

retaliatory conduct; (3) the one-day working suspension she received on August 30, 2017 was

sex-based discriminatory and/or retaliatory conduct; and (4) Mr. Cline's allegations to ODOT

investigators that Ms. Collins falsified payroll records in March 2019 was sex-based

discriminatory and/or retaliatory conduct.

Ms. Collins does not argue that the time period should be equitably tolled or limited.[6]

However, she contends that her September 4, 2020 EEOC complaint was "based upon a

---

[6] Although tolling is not directly sought by Plaintiff, the Court also concludes that Ms. Collins's failure to file an
EEOC complaint earlier than September 4, 2020, should not be excused, nor should the period be tolled, based on an
alleged fear that reporting would result in retaliation.  *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th
Cir. 2008) ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the
employee's duty… to alert the employer to the allegedly hostile work environment.")

continuing violation from 2014 when she complained to Kunze and MacAdam about the sex-based disparate treatment of women in District 11," and that the Court should therefore find all claims timely and actionable.  (ECF Doc. 46, pp. 17-19.)  Her reliance upon a "continuing violation theory" (*id.* at p. 19) to preserve her discrete claims of discrimination and retaliation based on actions prior to November 9, 2019, is misplaced.

The Sixth Circuit reexamined its "continuing violation" law in *Sharpe v. Cureton*, 319 F.3d 259 (6th Cir. 2003), after the Supreme Court limited the "viability of the doctrine" in *Nat'l R.R. Passenger Corp.  See Sharpe*, 319 F.3d at 267.   "[W]hen an employee seeks redress for discrete acts of discrimination or retaliation," the Sixth Circuit held that "the continuing violation doctrine may not be invoked to allow recovery for acts that occurred outside the filing period." *Id.* (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 112-14); *see also Taylor v. Donahoe*, 452 F. App'x 614, 619 (6th Cir. 2011); *Khatri v. Ohio State Univ.*, No. 21-3193, 2022 WL 620147, at *4 (6th Cir. Jan. 25, 2022) ("When a Title VII claim is based on discrete acts of discrimination, 'the continuing violation doctrine may not be invoked to allow recovery for acts that took place outside the filing period.'") (quoting *Sharpe*, 319 F.3d at 267), *cert. denied,* 143 S. Ct. 248, 214 L. Ed. 2d 85 (2022).

For the reasons explained above, the Court finds all discrete claims of disparate treatment and retaliation occurring prior to November 9, 2019, are time-barred.  As to the discrete claims of sex-based retaliation occurring on or after November 9, 2019, the Court will address in Sections III.B & III.C., *infra*, whether there are genuine issues of material fact to preclude dismissal.  As to disparate treatment, however, Ms. Collins has only identified one discrete claim in opposition to Defendants' motion for summary judgment, challenging her non-selection for the Fiscal Officer 2 position in 2014.  (ECF Doc. 46, pp. 28-29.)  She contends that "[a]

reasonable jury could conclude that the decision to select a male [for the finance position in 2014] was mere pretext for discrimination against Collins and the other female candidate." (*Id.* at p. 29.)  Since discrete acts of discrimination occurring prior to November 9, 2019, are time barred, the Court declines to consider the claim of disparate treatment premised on Plaintiff's non-selection for the Fiscal Officer 2 position in 2014 and dismisses that claim with prejudice, in addition to all other discrete claims of disparate treatment or retaliation occurring prior to November 9, 2019.

### 3.    Timeliness of Hostile Work Environment Claim

In addition to the discrete claims discussed above, Ms. Collins alleges a hostile work environment dating back to 2014, when she verbally complained to Mr. Kunze and Mr. MacAdam that her non-selection for the Fiscal Officer 2 position was sex-based discrimination. (ECF Doc. 46, pp. 17-18.)

As explained in Section III.A.1. *supra*, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 122.  Defendants contend that Ms. Collins fails as a matter of law to establish a sex-based hostile work environment, but they do not argue that Ms. Collins's hostile work environment claim was not timely.  (*See e.g.*, ECF Doc. 47 (Defendants' Reply Brief) ("Due to Collins having filed her EEOC charge on September 4, 2020, only events from November 9, 2019 would be actionable *for the purposes of her Title VII disparate treatment and retaliation claims*.") (emphasis added) (footnote omitted).)

Even if Defendants did challenge the timeliness of the hostile work environment claims, the Court would find there are genuine issues of material fact that preclude a finding that the

hostile work environment claim is untimely.  Ms. Collins's September 4, 2020 EEOC filing alleges one or more instances of alleged unlawful employment practices that occurred on or after November 9, 2019, with the latest instance occurring in July 2020.  (ECF Doc. 44-5, pp. 12, 19-22.)  She then filed an amended EEOC charge on May 5, 2021, asserting continued sex-based discrimination through at least April 19, 2021.  (*Id*. at pp. 23-38.)  She alleges that discrimination was continuous from 2014.  (*Id*. at pp. 12, 23.)  The Court finds a genuine issue of material fact exists as to "whether the acts about which . . . [Ms. Collins] complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period."  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 120.

For the reasons explained above, the Court concludes that genuine issues of material preclude this Court from finding Ms. Collins's hostile work environment claim time barred.

**B.**  **Whether Genuine Issues of Material Fact Preclude Summary Judgment in Defendants' Favor on Plaintiff's Sex-Based Retaliation Claim**

As to the discrete claims of sex-based retaliation which are not time barred because they are alleged to have occurred on or after November 9, 2019, the Court turns to whether Ms. Collins has demonstrated a genuine issue of material fact as to the merits of those claims.

**1.**    **Legal Framework for Title VII Sex-Based Retaliation**

A plaintiff may prove unlawful retaliation under Title VII through presentation of "direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework."  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).  "Direct evidence is that evidence which, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action."  *Id.* (emphasis in original).  In contrast, evidence that "would not require the conclusion that defendant unlawfully retaliated against plaintiff," but only permit that conclusion based on "a series of inferences arising from plaintiff's evidence" is not

direct evidence.  *Id.*  Absent direct evidence of retaliation, "[a] plaintiff must establish a *prima facie* case of unlawful retaliation."  *Id.*

To establish a *prima facie* case of Title VII retaliation under the *McDonnell Douglas* framework, a plaintiff must demonstrate: "(1) [s]he engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns,* 264 F. App'x 463, 466 (6th Cir. 2007) (citing *Abbott,* 348 F.3d at 542, and *Burlington N.,* 548 U.S. 53, 67–68 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action"))).

A plaintiff's burden to establish a *prima facie* case is not difficult.  *Abbott*, 348 F.3d at 542; *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020).  "To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a 'but for' cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate." *George*, 966 F.3d at 459 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).  "In other words, 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action' or otherwise engaged in protected activity."  *George*, 966 F.3d at 459–60 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Once a plaintiff has met her burden to establish a *prima facie* case, "the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the

adverse action." *Abbott*, 348 F.3d at 542. "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." *Id.* If the plaintiff can demonstrate that the "proffered, non-discriminatory reason is a pretext, then the fact finder *may* infer unlawful retaliation." *Id.* (emphasis in original). While the *McDonnell Douglas* involves burden shifting, the burden of persuasion remains with the plaintiff throughout. *Id.*

### 2. Plaintiff's Claims of Retaliation

Plaintiff asserts that the following adverse employment actions, occurring on or after November 9, 2019, were retaliatory: (1) the September 23, 2020 two-day suspension; (2) the October 5, 2020 list of expectations; and (3) the March 2021 discipline for failing to comply with expectations.[7] (ECF Doc. 46, pp. 20-25.) She asserts that it was only after she complained to Mr. Kunze and Mr. MacAdam that "she was more qualified than the male selected and that women in District 11 had been treated less favorably than the men" in 2014 that her "career track stalled, and she was subjected to progressive discipline, even after she complained in 2020 about the discrimination and retaliation she had been subjected to in the workplace." (*Id*. at pp. 20,

---

[7] Ms. Collins also argues in her opposition brief that the August 30, 2107 written reprimand and one-day working suspension were retaliatory adverse employment actions. (ECF Doc. 46, pp. 20-21.) For the reasons explained in Section III.A.2. *supra*, this retaliation claim is not actionable because the discrete act falls outside the filing period. The Complaint also contains a host of other allegations. Although ODOT addresses other claims of alleged retaliatory conduct (ECF Doc. 44, p. 36), Ms. Collins does not argue or present evidence in support of a finding that those claims constitute retaliatory employment actions. It is not this Court's "duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin Cnty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir.2007)), *aff'd*, 399 F. App'x 62 (6th Cir. 2010). Accordingly, the Court's analysis addresses only the retaliatory actions which are not time-barred and were identified and discussed by Ms. Collins.

25.)  She argues that "[t]he retaliation she has been subjected to has resulted in adverse job action in the form of a three-day unpaid suspension and a stalled career." (*Id*. at p. 25.)

Defendants assert that Ms. Collins cannot establish a *prima facie* case, that Defendants can articulate legitimate, non-discriminatory reasons for each adverse action, and that Plaintiff cannot show that Defendants' decisions were a pretext for retaliation.  (ECF Doc. 44, pp. 32-40; ECF Doc. 6-11.)  The Court will address each argument in turn.

However, before turning to whether Ms. Collins has presented sufficient evidence to establish a *prima facie* case of sex-based retaliation, the Court will first address Defendants' contention that it is not enough for Ms. Collins to rely solely on her own self-serving deposition testimony to survive summary judgment.  (ECF Doc. 47, pp. 2, 5, 6, 8, 11.)  Although "blatantly and demonstrably false" self-serving testimony "may not create a *genuine* issue of material fact," the Sixth Circuit has held that "self-serving statements can create a genuine dispute of material fact to be resolved at trial." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (emphasis in original) (internal citations omitted); *see also Gresham v. Meden*, 938 F.3d 847, 850 (6th Cir. 2019) ("At one level, all statements in litigation are self-serving.  There's nothing wrong with that.  So long as the allegations are plausible at the pleading stage and supported by evidence at the summary judgment stage, they will be considered.")  Absent a finding that Ms. Collins's deposition testimony was blatantly and demonstrably false, the Court finds it appropriate to rely on Ms. Collins's own deposition testimony in support of her opposition to summary judgment.

      a.      **Whether Plaintiff Has Presented Sufficient Evidence to Establish *Prima Facie* Sex-Based Retaliation**

The first and second elements of a *prima facie* case are that (1) Ms. Collins "engaged in activity protected by Title VII" and (2) "[her] exercise of such protected activity was known by the defendant." *Laster*, 746 F.3d at 730.  The Court finds Ms. Collins has presented sufficient

evidence from which a reasonable jury could conclude that she engaged in activity protected by Title VII and that ODOT knew of her protected activity.

It is undisputed that Ms. Collins filed a charge with the EEOC on September 4, 2020, alleging that she was subjected to sex-based discrimination.  (ECF Doc. 1-1; ECF Doc. 44-5, p. 2, ¶ 8.)  ODOT acknowledges it received notice of the September 4, 2020 EEOC charge on November 10, 2020.  (ECF Doc. 44-5, p. 2, ¶ 8.)  The Court finds that there is a genuine issue of material fact as to whether ODOT received notice of the EEOC charge earlier than November 10, 2020, in light of Ms. Collins's assertion that she told LRO Hurst about filing her EEOC charge at a September 23, 2020 meeting.  (ECF Doc. 46, p. 22; ECF Doc. 35-9, p. 4; Collins Depo., pp. 139:17-22, 143:18-145:5.)  She also asserts that she told LRO Hurst she thought the discipline was being imposed in retaliation for the Bates/Cline situation.  (Collins Depo., pp. 194:12-195:16.)  Although Mr. Hurst denies that Ms. Collins told her about the EEOC charge or complained about sex-based discrimination or retaliation (Hurst Decl., p. 2, ¶ 12), the Court finds Ms. Collins has established a genuine dispute of material fact on this point.

There is also undisputed evidence that Ms. Collins engaged in protected activity after filing the EEOC charge, and that Defendants knew of this activity.[8]  She filed an internal EEO complaint on March 3, 2021, alleging she was being subjected to retaliatory behavior and/or sexual harassment.  (Fogt Decl., pp. 2-3, ¶ 10; ECF Doc. 44-5, p. 39.)  ODOT had knowledge of

---

[8] Ms. Collins also emailed Ms. Blocker on October 28, 2020, complaining about retaliation and harassment (Blocker Depo., pp. 79:20-23; 80:14-82:3; Blocker Decl., p. 3, ¶ 8; ECF Doc. 39-3, p. 2), and emailed legal counsel at ODOT on January 11, 2021, stating: "I am reaching out, again, for your assistance in stopping the retaliation I am experiencing in District 11" (ECF Doc. 38-2, pp. 3-4; Hurst Decl., p. 2, ¶ 13).  These emails may not be sufficient evidence of protected activity, since they do not specifically reference acts of sex discrimination.  *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (explaining that "an employee may not invoke the protections of the Act by making a vague charge of discrimination") (internal citations and quotations omitted).  Ultimately, it is not necessary for this Court to determine whether the emails constitute protected activity, since the Court has found sufficient evidence to create genuine issues of material fact as to the first and second elements of a *prima facie* case without considering them.

this complaint, as evidenced by the fact that the OEO office contacted Ms. Collins on March 24, 2021, to gather information regarding the complaint.  (ECF Doc. 44-5, p. 39.)

Further, there is a genuine issue of fact as to whether Ms. Collins engaged in protected activity before filing her September 2020 EEOC charge.  She testified that she verbally complained to Mr. Kunze and Mr. MacAdam after she was not selected for the Fiscal Officer 2 position in 2014, telling them she was more qualified than the male selected that that she felt the women in District 11 were not treated as favorably as men.  (Collins Depo., p. 63:17-20, p. 64:1-5, pp. 264:16-265:15, p. 268:12-269:2.)  Ms. Collins's deposition testimony creates an issue of fact as to whether she engaged in protected activity that was known to Defendants.[9]  Mr. MacAdam acknowledges that Ms. Collins complained to him about not being selected because she thought she was the most qualified candidate.  (MacAdam Depo., p. 21:10-22:9.)  Mr. Kunze only acknowledges that he could tell Ms. Collins was upset when he told her Mr. Bates had been selected for the position; he denies that Ms. Collins complained to him about the selection of Mr. Bates or that Mr. Bates was not qualified for the position.  (Kunze Depo., pp. 36:1-37:6.)  Despite the conflicting testimony of Mr. Kunze and Mr. McAdam, the Court finds Ms. Collins has established a dispute of material fact as to whether she engaged in protected activities in 2014 that were known to Defendants.

The third and fourth elements of a *prima facie* case are that (3) Defendants "took an action that was 'materially adverse' to" Ms. Collins and (4) "a causal connection existed between the protected activity and the materially adverse action."  *Laster*, 746 F.3d at 730.  The Court finds Ms. Collins has also presented sufficient evidence to create a genuine issue of fact as to

---

[9] Although Ms. Collins's non-selection for the position in 2014 is not actionable as a discrete claim of Title VII sex discrimination, evidence relating to conversations between Ms. Collins and Mr. MacAdam and Mr. Kunze is not wholly irrelevant to whether she engaged in protected activity and/or ODOT's knowledge of that activity.

whether ODOT took action that was "materially adverse" to Ms. Collins after learning of the protected activity, and that a causal connection existed between the protected activity and the materially adverse action.

After Ms. Collins filed her EEOC charge on September 4, 2020, ODOT took several actions that a reasonable jury could conclude were "materially adverse" to Ms. Collins.  On September 23, 2020, ODOT imposed a two-day working suspension, albeit with no loss in pay or benefits.  (ECF Doc. 35-9, pp. 1-3, 5-6; Hurst Decl., p. 2, ¶ 11.)  On October 5, 2020, ODOT implemented an expectations sheet that set new work requirements in addition to Ms. Collins's established job duties, including requirements regarding core hours, flex time, and requesting time off, and a requirement that she provide weekly email summaries every Friday.  (ECF Doc. 35-10, p. 1.)  Finally, ODOT imposed a three-day, non-working suspension without pay on March 22, 2021, based on Ms. Collins's failure to comply with certain requirements from her expectations agreement.  (Hurst Decl., p. 3, ¶ 15; ECF Doc. 44-6, pp. 9-12.)

As to the causal connection between the protected activity and the materially adverse actions, the evidence establishes at least a question of fact as to the following alleged facts: Ms. Collins filed an EEOC charge on September 4, 2020 and informed LRO Hurst on September 23, 2020 that she had filed the charge; ODOT thereafter imposed a two-day working suspension; Ms. Collins told LRO Hurst that she thought the discipline was being imposed on a retaliatory basis; ODOT added new work requirements pursuant to an expectations agreement in October 2020; Ms. Collins complained to Ms. Blocker and legal counsel at ODOT regarding retaliation and harassment in October 2020 and January 2021; ODOT initiated an investigative interview and disciplinary proceedings in February and March 2021 based on alleged violations of the expectations agreement; and ODOT imposed a three-day, non-working suspension without pay

36

in March 2021 based on Ms. Collins's failure to meet the work requirements imposed by the

expectations agreement.  The Court finds a reasonable jury could find a causal connection

between the protected activities and alleged retaliatory acts outlined above.

For the reasons explained above, the Court finds that Ms. Collins has presented sufficient

evidence to establish genuine issues of material fact precluding summary judgment as to whether

Ms. Collins can establish a *prima facie* case of sex-based retaliation.

### b.  Whether Defendants Articulated Legitimate, Non-Discriminatory Reasons for the Adverse Actions

Even if Plaintiff can establish a *prima facie* case of retaliation, ODOT argues it had

legitimate, non-discriminatory reasons for taking the actions it did.  (ECF Doc. 44, p. 38.)  Ms.

Collins agrees, stating: "ODOT has articulated facially legitimate, nondiscriminatory /

nonretaliatory reasons for the actions Collins claims are retaliatory, particularly the discipline."

(ECF Doc. 46, p. 24.)  She argues, however, that she "presented evidence from which a jury

could find that the reasons stated for the discipline are not the true reasons and are merely pretext

for retaliation."  (*Id*.)  Accordingly, the Court turns to pretext.

### c.  Whether Plaintiff Has Presented Sufficient Evidence of Pretext

Ms. Collins contends that she has presented sufficient evidence from which a reasonable

jury could conclude that ODOT's reasons for disciplining her were pretextual.  (ECF Doc. 46,

pp. 24-25.)  It is a plaintiff's burden to demonstrate by a preponderance of the evidence that the

proffered non-discriminatory reason for taking action was "a mere pretext for discrimination by

establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the

adverse action; or 3) was insufficient to motivate the adverse action."  *Abbott*, 348 F.3d at 542.

"[T]he plaintiff must allege more than a dispute over the facts upon which [her] discharge was

based.  [She] must put forth evidence which demonstrates that the employer did not 'honestly

believe' in the proffered non-discriminatory reason for its adverse employment action."

*Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001).  The Sixth Circuit explains

that "[p]retext is a commonsense inquiry: did the employer [take action against] the employee for

the stated reason or not?"  *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).  If

the plaintiff can demonstrate that the "proffered, non-discriminatory reason is a pretext, then the

fact finder *may* infer unlawful retaliation."  *Abbott*, 348 F.3d at 542 (emphasis in original).

ODOT contends that discipline was imposed based on Ms. Collins's disregard of direct

orders and expectations of her supervisors, and that the expectations sheet was implemented after

communicating with Ms. Collins and was intended to provide her with a clearly defined

statement of her supervisor's expectations.  (ECF Doc. 44, p. 38.)  Ms. Collins's entire argument

on the issue of pretext is:

> Collins has demonstrated that ODOT's stated reasons for the progressive discipline
> were and the hiring decisions were not what motivated District 11 to engage in the
> conduct toward Collins. Prior to 2014, she enjoyed an unblemished career with
> ODOT and was promoted into positions of more responsibility. [] It was only after
> her complaints to Kunze and MacAdams in 2014 that her career track stalled, and
> she was subjected to progressive discipline, even after she complained in 2020
> about the discrimination and retaliation she had been subjected to in the workplace.
> The retaliation she has been subjected to has resulted in adverse job action in the
> form of a three-day unpaid suspension and a stalled career. She has produced
> sufficient evidence from which a jury could reasonably reject ODOT's actions and
> explanation and infer that ODOT intentionally discriminated against her.

(ECF Doc. 46, p. 25 (citations omitted).)  Considering these conclusory arguments, the Court

finds that Ms. Collins has not presented sufficient evidence from which a reasonable jury could

conclude that ODOT's decisions to discipline Ms. Collins in 2020 and 2021 were pretextual.

She has not shown that the true motivation was to retaliate against her for complaining about

sex-based disparate treatment in 2014, particularly when those complaints were made to

individuals who were not involved in the disciplinary decisions in 2020 or 2021.

38

Earlier in her brief, Ms. Collins argued that her March 2021 discipline for failing to timely submit a weekly summary was not well-founded because she provided valid reasons why her reports were not timely.  (*Id*. at p. 23.)  But Ms. Collins was provided the opportunity to present those same arguments in a pre-disciplinary hearing with an LRO from a different district.  (ECF Doc. 37-7, pp. 9-10.)  Ms. Collins's continued argument that the discipline was not warranted is based on her opinion alone.  Similarly, her argument that her complaints in 2014 were the cause of her discipline in 2020 and 2021 is based on her own belief alone.

The Court observes that there is evidence to suggest that Ms. Laughlin and Ms. Collins had a less than ideal supervisor/supervisee relationship and that Ms. Laughlin may have required more of her direct reports, including Ms. Collins, than was required by other supervisors at ODOT.  Those higher expectations may also have resulted in the imposition of discipline that Ms. Collins felt was unwarranted.  However, she has pointed to no evidence to support a claim that Ms. Laughlin treated her different based on her sex or because she complained of sex discrimination.  Even to the extent that Ms. Collins claims that the decision to make Ms. Laughlin her supervisor was retaliatory, Ms. Collins has pointed to no evidence to suggest that such action was based on her complaints of sex discrimination.  Indeed, Ms. Collins believed that Mr. Corey reassigned Ms. Laughlin as her supervisor to punish her for his friend, Mr. Cline, losing his job.  (Collins Depo., pp. 131:15-132:20.)  Mr. Cline did not lose his job because of complaints of sex discrimination.  Rather, as outlined in the factual background, Mr. Cline resigned following an OIG investigation that found "reasonable cause to believe that a wrongful act (Conflict of Interest) was committed."  (Rossi Decl., p. 2, ¶ 7.)  Additionally, OIG investigators "determined that Cline began to treat Carrie Collins as if she was the person responsible for bringing this unwanted attention to the BHR/Accounting section" (ECF Doc. 44-

3, p. 72) and a later OIS investigation confirmed that Ms. Collins was retaliated against by Mr.
Cline due to his and Mr. Bates's belief that she was the anonymous complainant (Rossi Decl., p.
2, ¶ 10; ECF Doc. 44-3, p. 44; ECF Doc. 44-6 ("Hurst Decl."), p. 1, ¶ 5).

The Court finds that Ms. Collins has pointed to no specific evidence that ODOT's stated
reasons for disciplining her had no basis in fact, did not actually motivate the adverse action, or
were insufficient to motivate the adverse action.  *See Abbott*, 348 F.3d at 542.  She has not
presented evidence from which a reasonable jury could find that ODOT "did not 'honestly
believe' in the proffered non-discriminatory reason for its adverse employment action."
*Braithwaite*, 258 F.3d at 493–94.  Accordingly, the Court cannot find based on the evidence
presented that a reasonable jury could conclude that ODOT's proffered, non-discriminatory
reasons were pretextual.  For these reasons, the Court dismisses with prejudice Ms. Collins's
discrete claims of sex-based retaliation occurring after November 9, 2019.

### C.  Whether Genuine Issues of Material Fact Exist to Preclude Summary Judgment in Defendants' Favor on Plaintiff's Hostile Work Environment Claim

Having addressed all of Ms. Collins's discrete claims of sex-based retaliation and
disparate treatment, the Court turns finally to Ms. Collins's hostile work environment claim.

### 1.  Legal Framework for Title VII Sex-Based Hostile Work Environment

"[T]o establish a *prima facie* case of hostile work environment based on sexual
harassment, [Ms. Collins] must show by a preponderance of the evidence: (1) that she was a
member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that
the harassment was based on sex; (4) that the harassment unreasonably interfered with her work
performance by creating a hostile, offensive, or intimidating work environment; and (5) that
there is a basis for employer liability."  *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th
Cir. 2008); *see also Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005).  To

succeed, a plaintiff must show that the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Clark*, 400 F.3d at 351 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

The Supreme Court has explained that all the circumstances must be looked at to determine whether an environment is "hostile" or "abusive." *Harris*, 510 U.S. at 23.  Factors for consideration are: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*  The Sixth Circuit has stated that it is "more likely to conclude that conduct is pervasive when the sexually harassing conduct is continuous and not sporadic." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021). Additionally, as a general matter, "harassment involving an element of physical invasion is more severe than harassing comments alone." *Id.* (internal citations and quotations omitted).

Ultimately, the workplace environment must be both objectively and subjectively hostile or abusive to violate Title VII. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris*, 510 U.S. at 21–22).

### 2.     Plaintiff's Hostile Work Environment Claim

Ms. Collins asserts she has been subjected to a hostile work environment that "is severe and pervasive and has negatively affected her career progression" and that she has "been locked into the position she was promoted to in 2012" from when she complained in 2014 to the present. (ECF Doc. 46, p. 27.)   She further asserts that "[t]he manner in which District 11 is operated, with a put-up and shut-up attitude created, fostered and condoned a hostile work environment

that [she] had to endure." (*Id.*) She argues that the following evidence is indicative of the hostile work environment to which she was subjected:

> On many occasions Collins heard MacAdams complain that a female he supervised made more money than he did and she did not deserve it. [] He referred to another female employee as his "albatross". [] Each of these women were subjected to job audits which froze their pay. [] Collins never heard MacAdam make such comments toward men. [] In 2014 Kunze denied Collins' request to obtain her CDL for auxiliary snow duty, but approved males' requests. [] She was denied a promotion to a finance position, despite having more education and experience than the male candidate who was awarded the position. [] MacAdam would comment on how she was dressed and would ask her to dress up for ODOT events. [] Kunze commented in a staff meeting, ["]you shouldn't get your paycheck where you get your pussy". [] On another occasion, Kunze approached Collins in her office and asked is she was dating anyone. [] MacAdam required the female employees to cook breakfast for District 11 when they served breakfast to the employees. [] The way Kunze interacted with females was disrespectful. [] These comments are based on sex. In 2014 after she was not selected for the finance position, she complained to Kunze and MacAdam about the disparate treatment of women in District 11. No action was taken was taken to address her complaints. The action taken was against her.

(ECF Doc. 46, p. 26 (citing Complaint, ¶¶ 25-28, 30-32 and Collins Depo., pp. 39-40, 42-43, 58, 59-61).) She also asserts that she spoke with coworkers about her concerns that she had been subjected to discrimination and was told it would be career suicide for her to do anything about it. (*Id.* (citing ECF Doc. 35, pp. 65:19-66:24).) She argues that "[t]his, along with the unwelcome and offensive conduct she endured in the workplace sets the backdrop for her hostile work environment claim." (ECF Doc. 36, p. 26.)

The Court observes that Plaintiff cites primarily to the Complaint as support for several of the alleged sexually harassing comments. It is not this Court's "duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam*, 637 F. Supp. 2d at 576. But even construing the evidence highlighted by Ms. Collins in her opposition brief (ECF Doc. 46, p. 26) and other evidence outlined in Section I.A., *supra*, in Ms. Collin's favor, there is insufficient evidence from which a reasonable jury could

find she was subjected to a hostile work environment based on sex that was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris* 510 U.S. at 21.

Although Ms. Collins argues she has been subject to a hostile work environment since 2014, it is noteworthy that she did not make a formal complaint until six years later, in her September 2020 EEOC filing.  Indeed, while Ms. Collins reported during an interview with Mr. Rossi in January 2020 that she believed she was the target of retaliatory and hostile behavior by Mr. Bates and Mr. Cline, she asserted this was based on their belief that she was the anonymous complainant for the investigation.  (Rossi Decl., p. 3, ¶ 13; ECF Doc. 44-3, pp. 225, 226.)  She did not tell Mr. Rossi that she felt discriminated against or retaliated against by Mr. Bates, Mr. Cline, or any other ODOT employee based on her sex or because she complained about sex discrimination.  (Rossi Decl., pp. 2-3, ¶¶ 11-12; Collins Depo., pp. 101:8-102:16.)  Consistent with Ms. Collins's own complaints, the OIS investigation completed in February 2020 confirmed that she was subject to retaliation by Mr. Cline due to his and Mr. Bates's belief that she was the anonymous complainant, without any reference to sex-based discrimination or retaliation.  (Rossi Decl., p. 2, ¶ 10; ECF Doc. 44-3, p. 44; Hurst Decl., p. 1, ¶ 5.)

The Court next turns to the factors for consideration in determining whether alleged conduct was "hostile" or "abusive," including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.  The Sixth Circuit has also stated it is "more likely to conclude that conduct is pervasive when the sexually harassing conduct is continuous and not sporadic."  *Wyatt*, 999 F.3d at 411.

Certainly, there is no evidence that the alleged harassment involved physical threats or invasion.  The evidence in many instances also lacks supporting details that would allow the Court to assess the frequency and longevity of the challenged conduct.  Ultimately, the evidence does not create a material question of fact as to whether Ms. Collins suffered severe, offensive sexual comments or sex-based harassment on a continual or pervasive basis.

For instance, when asked at her deposition when Mr. MacAdam commented on how she was dressed or how she should dress up for ODOT events, Ms. Collins simply described his behavior as "recurring," "consistent treatment," that "was always that way."  (Collins Depo., p. 40:4-6).  She could not recall the exact time frame or what he said "specifically."  (*Id.* at pp. 39:16-40:10.)  Although she asserted that Mr. MacAdam expected women to cook and serve for breakfast work events, she could not recall when those events took place and acknowledged that a male cooked for other events.  (*Id.* at pp. 58:8-59:5.)  As to his alleged comments that women should never have been in certain key positions, Ms. Collins said he made those comments prior to 2014.  (Collins Depo., pp. 56:20-58:6.)  Ms. Collins also testified that Mr. Kunze subjected her to unwelcome sexual harassment by asking her out, asking her if she was dating anyone, and commenting during a staff meeting that "you shouldn't get your paycheck where you get your pussy," but again could not recall the specific time frame; she could only recall that it occurred at a time when Mr. Kunze was going through a divorce.  (*Id.* at pp. 42:10-43:7.)  While the comments described above could certainly be construed as inappropriate sex-based comments in the workplace, Ms. Collins's testimony falls far short of establishing that the alleged behavior was severe or pervasive enough to support an actionable hostile work environment claim.

As noted above, the Court observes that some of the actions Ms. Collins describes as contributing to a hostile work environment are supported only by reference to the allegations in

44

her Complaint, including Mr. Kunze's denial of her request to obtain her CDL license for auxiliary snow duty in 2014, while approving requests submitted by males, and Mr. MacAdam's poor treatment of females in general.  (ECF Doc. 46, p. 26 (citing Complaint).)  This Court may not consider assertions of fact unsupported by sufficient evidentiary material in determining whether Ms. Collins has established a material question of fact to preclude summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials[.]"); *Celotex Corp.*, 477 U.S. at 325 (explaining a party cannot "resist a properly made motion by reference only to its pleadings"); *see also Matsushita Elec. Indus. Co.,* 475 U.S. at 586 (a party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").  But even if Ms. Collins had presented sufficient evidence to support these allegations, they are insufficient to change the Court's findings.

Ms. Collins alleges that she has been subjected to a hostile work environment dating back to 2014, or a span of six years.  However, as discussed, her allegations in many instances lack specificity or evidentiary support.  Even assuming sufficient specificity or evidentiary support, the allegations show sporadic occurrences over a six-year period that are not sufficiently severe to demonstrate an objectively and subjectively hostile work environment.  The more specific allegations of a hostile work environment are centered on statements made during 2014 and 2019.  Even viewing the alleged comments during those two years in the light most favorable to Ms. Collins, the Court finds that no reasonable jury could conclude that Ms. Collins was subjected to a hostile work environment based on sex in violation of Title VII.  While the

comments and conduct could be described as sex-based and inappropriate, that is not the standard.  To be an actionable hostile work environment, a plaintiff must demonstrate a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris*, 510 U.S. at 21.

Based on the foregoing and drawing all inferences from the voluminous evidence presented to the Court in the light most favorable to Ms. Collins, the Court finds that no reasonable jury could conclude that Ms. Collins was subjected to a hostile work environment based on sex in violation of Title VII.  Accordingly, the Court dismisses with prejudice Ms. Collins's hostile work environment claim.

## IV.    Conclusion

For the reasons set forth above, the Court **GRANTS** Defendants' Motion (ECF Doc. 44) and dismisses Plaintiff's Complaint with prejudice.

February 9, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge
